**DETROIT–MICHIGAN STOVE CO.**
v.
**UNITED STATES.**
No. 48600.

United States Court of Claims.
June 8, 1954.

Ralph W. Barbier, Detroit, Mich., for plaintiff. Raymond H. Berry, Roy M. Tolleson, Jr., and Barbier, McFarlane & Tolleson, Detroit, Mich., were on the briefs.

J. W. Hussey, Washington, D. C., with whom was Asst. Atty. Gen. H. Brian Holland, for defendant. Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

Plaintiff, Detroit-Michigan Stove Company, a Michigan corporation, brings this action to recover the sum of $87,742.08 with interest, representing excess profits tax for the calendar year 1943 alleged to have been wrongfully collected from plaintiff's predecessor corporation, A-B Stoves, Incorporated. Plaintiff acquired the assets and assumed the liabilities of this corporation April 25, 1945. This transaction is not in question. The issue presented is whether or not the transaction, hereinafter described, whereby A-B Stoves, Incorporated,[1] acquired the assets of A-B Stove Company in 1935, was a reorganization involving non-recognition of loss under the provisions of sections 112(b) (10) and 112(e) of the Internal Revenue Code,[2] so that the bases of the assets acquired by plaintiff in 1935 were the adjusted bases of the assets in the hands of the A-B Stove Company under the provisions of section 113(a) (22) of

1. Hereinafter sometimes referred to as plaintiff.

2. 26 U.S.C.(1946 Ed.) §§ 112(b) (10), 112(e), added by section 121 of the Revenue Act of 1943, 58 Stat. 21, 41–43.

"§ 112. Recognition of gain or loss.
* * *
"(b) *Exchanges solely in kind.* * *
"(10) Gain or loss not recognized on reorganization of corporations in certain *receivership and bankruptcy proceedings.* No gain or loss shall be recognized if property of a corporation (other than a railroad corporation, as

defined in section 77m of the National Bankruptcy Act, as amended) is transferred, in a taxable year of such corporation beginning after December 31, 1933, in pursuance of an order of the court having jurisdiction of such corporation—
"(A) in a receivership, foreclosure, or similar proceeding, or
"(B) in a proceeding under section 77B or Chapter X of the National Bankruptcy Act, as amended, to another corporation organized or made use of to effectuate a plan of reorganization approved by the court in such proceeding, in ex-

the Code.[3] The case is before the court on the merits upon an agreed stipulation of facts.

A-B Stoves, Inc., was incorporated under the laws of the State of Michigan on April 16, 1935, for the purpose of acquiring the assets of A-B Stove Company (hereinafter sometimes referred to as the old corporation). On August 1, 1935, A-B Stoves, Inc., acquired the assets of the old corporation.

The old corporation had been engaged in the business of manufacturing stoves for many years. On June 28, 1934, it became insolvent, was unable to pay its debts, and filed a petition in bankruptcy under section 77B of the Bankruptcy Act of 1898, as amended, 48 Stat. 912, 11 U.S.C.A. § 207, in the District Court of the United States for the Eastern District of Michigan. A trustee in bankruptcy was duly appointed by the court. At that time, the capitalization of the old corporation consisted of 4,364 shares of $100 par value preferred stock and 125,000 shares of $10 par value common stock, and its liabilities were approximately $384,000 in 6% first mortgage bonds with accrued interest thereon, $39,000 in notes payable, and $104,000 in accounts payable, a total of $527,000.

On December 20, 1934, A-B Stove Company submitted to the court a "Plan of Reorganization and Memorandum of Agreement," and on January 31, 1935, the court issued an order approving the plan subject to its acceptance by all parties concerned. On July 9, 1935, a supplemental order amending the plan was issued by the court.

The plan provided, *inter alia*, that Marshall Furnace Company (hereinafter Marshall) should buy all of the machinery and equipment of the old corporation for $35,000, payment therefor to be made by the six months' note of that company and with title to the property reserved in the trustee in bankruptcy until payment of the $35,000, together with payment of 80% of the purchase price of the inventory of the old corporation, had been made. There is no evidence of the value of the inventory, machinery and equipment of the old corporation. It was agreed that Marshall should buy from the trustee in bankruptcy the entire inventory of the old corporation, the purchase price to be determined as set forth in the plan, with payment to be made by the 25th day of the month following that in which Marshall took or used the inventory, but with the total purchase price to be paid within 13 months. It was further agreed that the trustee in bankruptcy would execute a lease to Marshall of the buildings and real estate of the old corporation at a monthly rental of $750, with an option in Marshall to purchase within one year for $75,000. The trustee in bankruptcy was to deliver to Marshall all of the notes and accounts receivable of the old corporation for collection (the amount of which is not shown), and Marshall was to deliver the proceeds of collections to the trustee. The trustee was to execute and deliver to Marshall a grant of privilege to use for one year the trade name, trade-marks, and patents belonging to the old corporation in carrying on the business, with this grant to extend to a "new corporation" contemplated by the agreement. This "new corporation" was to be organized by Marshall or its nominee prior to the expiration of the one-year option to purchase the buildings and real estate of the old corporation. Marshall agreed to assign and transfer to the new corporation the lease and option to purchase and, at cost, every right, title, and interest which Marshall then enjoyed under the agreement, so that the new corporation should

change solely for stock or securities in such other corporation."

Under section 112(e), if an exchange would be within the provisions of section 112(b) (10) were it not for the fact that the property received in exchange consists not only of "stock or securities in such other corporation", but also of other property or money, no loss from the exchange shall be recognized.

3.  26  U.S.C.(1946  Ed.)  §  113(a)  (22), added by section 121 of the Revenue Act of 1943, supra.

be substituted to every right, duty, and liability of Marshall under the agreement.

Under the plan as amended, Marshall carried on the business of the old corporation until July 31, 1935. The new corporation contemplated by the agreement was incorporated, on April 16, 1935, as A-B Stoves, Inc., with an authorized capitalization of 200,000 shares of no-par common stock,[4] of which 150,000 shares were sold to outside interests for $1.00 per share. The remaining 50,000 shares were reserved, for distribution to the stockholders of the old corporation, as hereinafter described. On August 1, 1935, the new corporation took over all of the assets of the old corporation, except cash and bills and accounts receivable, which were retained by the trustee in bankruptcy for distribution to creditors of the old corporation.

The new corporation, in addition to paying Marshall an agreed operating profit of $5,000 and assuming liabilities of $142,696.70, turned over to the trustee in bankruptcy $150,000 in cash, and the remaining 50,000 shares of no-par common stock of the new corporation for distribution to the preferred and common stockholders of the old corporation, as provided in the agreement.

The holders of 4,364 shares of $100 par value preferred stock of the old corporation received 33,333 shares of the new stock, and the holders of 125,000 shares of $10 par value common stock of the old corporation received 16,667 shares of the new stock, in proportion to their respective stockholdings in the old corporation. Each stockholder was required, as a condition to receiving his pro rata share of the stock of the new corporation, to turn in for cancellation his shares of stock in the old corporation. The holders of 6% first mortgage bonds in the principal amount of $384,000, with accrued interest thereon, holders of notes

payable in the principal amount of $39,-000, with accrued interest, and holders of accounts payable, and which the old corporation was unable to pay, in the amount of $104,000, received in liquidation cash payments from the trustee and inventory sales, of approximately 30 cents on the dollar in settlement of their claims against the old corporation. The secured creditors' indebtedness of $384,-000 had been reduced as a secured debt to $110,000. The bond holders and the holders of notes and accounts payable did not share in the distribution of stock of the new corporation.

Plaintiff carried the assets of the old corporation on its books at their cost to itself, a total of $160,001, as shown in findings 8–10. The aggregate adjusted cost bases to the old corporation of the properties transferred to plaintiff, as of August 1, 1935, was $497,201.22. On its excess profits tax returns for 1941, 1942, and 1943, plaintiff reported the amount it had paid ($160,001) for the assets of the old corporation as a component of invested capital. Plaintiff also computed depreciation on the basis of this amount for the purposes of its corporate income and excess profits tax returns for the years 1941, 1942, and 1943.

On October 27, 1944, plaintiff filed a timely claim for refund of excess profits tax paid by it for the calendar year 1943 in the amount of $87,742.08. The grounds asserted in support of the claim for refund were that plaintiff had acquired the assets of the old corporation in a tax-free reorganization under sections 112(b) (10) and 112(e), supra, and that the bases of the assets acquired by it from the old corporation were therefore the adjusted bases of those assets in the hands of the old corporation, under section 113(a) (22), supra. Plaintiff contended that it was entitled, therefore, (1) to additional depreciation deductions for the years 1941, 1942, and 1943; (2) to increased excess profits credits for the

---

4. The plan contemplated the issuance of 100,000 shares of stock, but this was increased by the court's amending order of July 9, 1935.

years 1941, 1942, and 1943; and (3) in computing its excess profits credits for the year 1943, to avail itself of a carry-over of unused excess profits credits for the years 1941 and 1942. The claim was disallowed on March 25, 1946, and a request for reconsideration was denied on June 16, 1947.

Plaintiff's contentions in this court are identical with those urged upon the Commissioner of Internal Revenue in support of its claim for refund, and the amount in controversy is, exclusive of interest, the same amount there claimed. Defendant takes the position that the transaction whereby plaintiff acquired the assets of the old corporation in 1935, did not qualify as one from which no gain or loss should be recognized under the provisions of sections 112(b) (10) and 112(e), and that absent a reorganization within the meaning of those sections the "basis" provisions of section 113(a) (22) have no application. Defendant's basic argument is that the "continuity of interest" requirement, implicit in section 112(b) (10) and explicit in Treasury Regulations 111, section 29.112(b) (10)–1, has not been satisfied in the present case. We think defendant is correct.

Treasury Regulations 111, section 29.-112(b) (10)–1, 26 C.F.R. 1949 Ed., p. 380, provides in part as follows:

"As used in section 112(b) (10), the term 'reorganization' is not controlled by the definition of 'reorganization' contained in section 112(g). However, certain basic requirements, implicit in the statute, which are essential to a reorganization under section 112(g), are likewise essential to qualify a transaction as a reorganization under section 112 (b) (10). Among these requirements are continuity of the business enterprise under the modified corporate form and a continuity of interest therein on the part of those persons who were the owners of the enterprise prior to the reorganization. Thus the nonrecognition accorded by section 112(b) (10) applies only to a genuine reorganization as distinguished from a liquidation and sale of property to either new or old interests supplying new capital and discharging the obligations of the old corporation. For the purpose of determining whether the requisite continuity of interest exists, the interest of creditors who have, by appropriate legal steps, obtained effective command of the property of an insolvent corporation is considered as the equivalent of a proprietary interest. But the mere possibility of a proprietary interest is not its equivalent. The determinative and controlling factors are the corporation's insolvency and the effective command by the creditors over its property. The term 'insolvent' as used in this section refers to insolvency at any time during the course of proceedings referred to in section 112(b) (10), either in the sense of excess of liabilities over assets or in the sense of inability to meet obligations as they mature."

Defendant contends that the "Plan of Reorganization" was merely a contract for the purchase and sale of the assets of the old corporation, not a reorganization within the meaning of the statute and the above quoted portion of the Regulations. On the facts we agree with defendant's contention.

It is clear that the nonrecognition of gain or loss accorded by section 112(b) (10) and the regulations, supra, was intended to and does apply only to an actual reorganization as distinguished from a liquidation and sale.[5] The nature of the transaction with which we are here concerned turns not upon abstract definitions but upon whether or not there was the requisite continuity of proprie-

5. See H.R.Rept.No.1079, 78th Cong., 2d Sess., p. 46.

tary interest in the new corporation "on the part of those persons who were the owners of the enterprise prior to the reorganization." If this question cannot be answered in the affirmative, which we think is the case, from the facts and circumstances before us, then there was no section 112(b) (10) reorganization from which no gain or loss should be recognized.

The preferred and common stockholders of the old corporation received only 50,000 shares of the stock, valued at $1.-00 a share, of the new corporation in exchange for and in cancellation of their $1,686,400 par value shares of stock of the old corporation. This was 25% of the total of 200,000 shares of stock issued by the new corporation. This stock was issued as "gratuitous stock." Plaintiff asserts that the stockholders of the old corporation thereby retained a continuing proprietary interest in the reorganized enterprise. We cannot agree. Prior to the sale by the Trustee to the Marshall Furnace Co., and later a transfer by that company to the new corporation, whose capital was contributed by outside interests, the investment and stock of the old stockholders was worthless. Defendant, in contending that there was no continuity of interest within the concept of the statute and section 29.112(b) (10)–1 of the Regulations, places emphasis upon the fact that the remaining 150,000 shares of the stock of the new corporation were sold to outside interests for $1.00 per share. We think this is important under the facts and circumstances of the case.

■ While the requirement of continuity of interest does not, in the absence of a specific statutory requirement of control, carry with it a requirement of continuity of control over the assets of the old corporation in their new corporate form, John A. Nelson Co. v. Helvering, 296 U.S. 374, 56 S.Ct. 273, 80 L. Ed. 281; New Jersey Mortgage & Title Co., 3 T.C. 1277, and "The transferors' stock in the transferee corporation may

not amount to more than a small minority interest; this dilution [with exceptions not here pertinent] of control will not affect the reorganization, as long as a substantial part of the transferors' proprietary interest, as measured by the value of the thing [assets, etc.] transferred, has been perpetuated." 6 Collier on Bankruptcy (14th Ed.), Par. 15.10 (10), pp. 5168–5169, yet there is inherent in the continuity of interest test the requirement that the interest which is perpetuated in the new corporation be the proprietary interest "of those persons who were the owners of the enterprise prior to the reorganization." We do not find that situation in this case. Where the stockholders of the old corporation continue to be represented in substantial measure in the affairs of the new one, those stockholders must have something of substantial value, which the old stockholders in this case did not have, to exchange for their stock in the new corporation in order for the transaction to come within the meaning of section 112 (b) (10). In our opinion the defendant rightly asserts that this was not so under the facts of the instant case.

■■ Where the debtor corporation in a section 77B proceeding is insolvent in the sense that its assets are exceeded by its liabilities, as the facts show was the case here, the stockholders consequently have no equity, and are excluded, by the full priority rule of Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; from any interest in the debtor. Case v. Los Angeles Lumber Co., Ltd., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. The equivalent of the proprietary interest of the stockholders of the debtor corporation vests in its creditors, and the continuity of interest test is satisfied where the transferee corporation issues its stock to such creditors. Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775; Cf. Chicago Stadium Corp., 13 T.C. 889. Most of the stock in this case was sold to outside interests. Where the proprietary interest of the

stockholders has completely disappeared by reason of the insolvency, in the bankruptcy sense, of the debtor corporation, which was clearly the situation in this case, the acquisition of the assets by the stockholders or their new corporation does not constitute a reorganization. See Tarleau, Some Tax Considerations in Reorganizations of Insolvent Corporations, N.Y.U. 8th Annual Institute on Federal Taxation, 201, 205–206. The proprietary interest of the stockholders of the old corporation is thereby broken. See Mascot Stove Co. v. Commissioner, 6 Cir., 120 F.2d 153, certiorari denied Mascot Stove Co. v. Helvering, 315 U.S. 802, 62 S.Ct. 630, 86 L.Ed. 1202; Templeton's Jewelers, Inc., v. United States, 6 Cir., 126 F.2d 251; Johnson, Insolvent Reorganizations and the Continuity of Proprietary Interest Rule, N.Y.U. 9th Annual Institute on Federal Taxation 1267, 1273; cf. Chicago Stadium Corp., supra. In this case there was, in reality, as shown by the facts, a sale of the assets of the old corporation and a new start with new interests.

We need not discuss the situation where the debtor corporation is insolvent, not in the sense that its assets are exceeded by its liabilities, but only in the sense that it is unable to meet its obligations as they mature. See Darrell, Creditors' Reorganizations and the Federal Income Tax, 57 Harv.L.Rev. 1009 et seq. In this case it is clear, we think, that the old corporation was insolvent in the sense that its liabilities far exceeded its assets, and in the end there had been a break in that continuity of interest necessary to a real "reorganization" contemplated by the statute and Regulation 111, section 29.112(b) (10)–1, supra.

Plaintiff is not entitled to recover and its petition is dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.

LARAMORE, Judge, took no part in the consideration or decision of this case.