WESTERN MASSACHUSETTS THE-ATRES, Inc., Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 5078.

United States Court of Appeals First Circuit.

Heard March 6, 1956.

Decided July 31, 1956.

Earl Johnson, Boston, Mass., with whom Joseph J. Geehern, Alan R. Trustman, and Nutter, McClennen & Fish, Boston, Mass., were on the brief, for petitioner.

David O. Walter, Atty., Dept. of Justice, Washington, D. C., with whom Charles K. Rice, Acting Asst. Atty. Gen., and Lee A. Jackson, Hilbert P. Zarky and Grant W. Wiprud, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

We have here for review a decision of the Tax Court of the United States, en-tered August 25, 1955, sustaining deficiencies in the excess profits tax of petitioner, Western Massachusetts Theatres, Inc., for the years 1943, 1944, and 1945. 24 T.C. 331.

The sole contested issue in the Tax Court was whether the transaction in which petitioner acquired certain properties in 1935 was one governed by § 112 (b) (10) of the Internal Revenue Code of 1939, 26 U.S.C.A., so as to make applicable the provisions of § 113(a) (22) in determining the basis of such properties for depreciation and invested capital purposes for the tax years 1943-1945.

Section 113(a) (22) provides that the basis of property in the hands of an acquiring corporation shall be the same as it would have been in the hands of the transferor corporation where the transfer was one to which § 112(b) (10) is applicable. Thus it is the latter section which is the crux of this case. Both sections just named were added to the Internal Revenue Code by the Revenue Act of 1943. It should be noted that the effect of this enactment upon the tax liability of corporations was limited to tax years beginning with 1943, but in regard to the tax computation for such years its provisions are applicable to property transferred as early as 1934.

So far as material here, § 112(b) (10) provides that:

"No gain or loss shall be recognized if property of a corporation * * * is transferred * * * in pursuance of an order of the court having jurisdiction of such corporation * * * in a receivership, foreclosure, or similar proceeding, * * * to another corporation organized or made use of to effectuate a plan of reorganization approved by the court in such proceeding, in exchange * * * for stock or securities in such other corporation."

In the instant case, where the issue is the basis for depreciation and invested capital purposes, it happens to be the taxpayer who argues for the application of § 112(b) (10), because the

basis of the old corporation in the properties in question was considerably higher than the basis applicable if that section does not apply, namely, the cost of the property to the acquiring corporation. In other cases, where the tax consequence of applying § 112(b) (10) is the opposite, no doubt the Commissioner will be maintaining the position here taken by the taxpayer. The "determination of the substantive question must not be controlled by whether in the particular case it is to the advantage of the government or of the taxpayer to make out that * * * [a] statutory reorganization has been effected." Lewis v. Commissioner, 1 Cir., 1949, 176 F.2d 646, 648.

The facts in this case were fully stipulated. As is typical of reorganization cases, the transaction was quite complicated. For present purposes the following condensed statement of the facts will suffice:

In February of 1933 Olympia Theatres, Inc., went into receivership in a Massachusetts state court. Olympia owned or controlled about one hundred theatres in New England, with 25 per cent of the total value of its assets represented by a group of theatres referred to in this case as the "G. B. Theatres." These properties had been acquired indirectly, in 1930, from G. B. Theatres Corporation, then an independent theatre chain controlled by two brothers, Samuel and Nathan E. Goldstein. The G. B. Theatres were subject to a mortgage which had been executed as security for an issue of 30-year bonds ("G. B. Bonds"), the obligation to pay which was assumed by Olympia.

In July of 1934 the state receivership court granted permission to foreclose the mortgage to the trustees under the indenture governing the G. B. Bonds. The Bondholders' Committee which had been formed the previous year intervened and presented a Plan of Reorganization, which ultimately was approved by the receivership court and put into effect. Under the Plan of Reorganization the petitioner herein, Western Massachusetts Theatres, Inc., was to be organized to acquire and operate the G. B. Theatres. The Bondholders' Committee bid in the properties at the foreclosure sale, paying for them largely by a partial cancellation marked on the deposited G. B. Bonds, and transferred the properties to the petitioner on December 16, 1935. The committee also transferred to the petitioner the deposited G. B. Bonds, the accumulated earnings of the G. B. Theatres under the receivership, and the contemplated deficiency claim against Olympia.

Each of the G. B. bondholders was to receive under the plan his choice of either (1) petitioner's bonds equal in face amount to the G. B. Bonds surrendered by him, or (2) cash equal to 65 per cent of the face value of his G. B. Bonds. In February of 1933 the Goldstein brothers, former owners of the G. B. theatre chain, owned approximately 34 per cent of the outstanding G. B. Bonds. Through interim acquisitions the Goldsteins owned approximately 65 per cent immediately prior to the transfer of the G. B. Theatres to petitioner on December 16, 1935. On both dates approximately two per cent of the bonds were owned by Lares Theatres Corporation, which was a Paramount subsidiary, as was Olympia.

As the plan was put into effect, almost all of the old bondholders, including the Goldsteins and Lares Theatres Corp., accepted the first alternative of receiving petitioner's bonds. About $6,000 in cash was used to pay off dissenters. The Goldsteins, who supplied that cash, received the new bonds allocable to those few bondholders (one per cent).

Under further provisions of the plan, the Goldsteins and Lares Theatres Corp. transferred to petitioner leases to additional theatres and equipment for all the theatres, secured for the petitioner a ten-year Paramount franchise, agreed to management and service contracts, and loaned the petitioner some $82,000 in addition to the amount used to pay off non-participating bondholders. In addition to the Goldsteins' pro rata share of the new bonds and the bonds given

on account of the $6,000 loan, petitioner gave to the Bondholders' Committee for transfer to the Goldsteins its notes for the other loan and all of its Class A and Class B stock. Lares Theatres Corp. similarly received its pro rata share of new bonds, notes for its loan, and also the deficiency claim against Olympia. Under the plan the Goldsteins sold the entire issue of Class B stock to Lares Theatres Corp. for $107,500. The Goldsteins kept the Class A stock and the money paid to them for the Class B stock. The two classes of stock were to share equally upon liquidation, and each (with the Goldsteins' control of the bonds) elected an equal number of directors.

It will be noted, then, that all of the new corporation's stock went to the two interests which had owned approximately 36 per cent of the old bonds at the beginning of the receivership and 67 per cent prior to the transfer of the property to the new corporation. The owners of the other 33 per cent of the old bonds were not permitted to acquire stock under the plan, but all but about one per cent of them did choose the alternative of taking new bonds rather than cash for the surrender of their old bonds.

After an interim period of operation under a pooling agreement with the Olympia receivers, the petitioner operated the G. B. Theatres independently. In 1937 the rest of Olympia's assets were transferred to another corporation in a separate transaction for cash.

So far as the literal requirements of § 112(b) (10) are concerned, we have no doubt that the transaction above related satisfies the terms of the statute. Cf. Helvering v. Alabama Asphaltic Limestone Co., 1942, 315 U.S. 179, 184, 62 S.Ct. 540, 86 L.Ed. 775; Albert W. Russel, 3 C.C.H. Tax Ct.Mem. 817 (1944); H.R.Conf.Rep. No. 1079, 78th Cong., 2d Sess. 47–48 (1944). The Commissioner did make some point before the Tax Court of the fact that only 25 per cent of Olympia's assets were transferred to petitioner herein. But at the oral argument before us, government counsel expressly abandoned that par-

ticular point—quite correctly, in view of our decision in Lewis v. Commissioner, 1 Cir., 1949, 176 F.2d 646.

But the foregoing does not settle the present case. There still remains to be determined the substantial issue between the parties in the Tax Court, and what we understand to be the crucial issue here, namely, whether the transaction in effect demonstrates the requisite "continuity of interest" between the owners of the equity in the property transferred and the equity owners of the acquiring corporation.

This "continuity of interest" concept is a judicially developed doctrine that was originally worked out by the Supreme Court in connection with the loose reorganization definitions found in the law prior to the Revenue Act of 1934. In essence, as stated by a leading tax commentator, the concept imposes a requirement that "the transferor or its proprietors must have retained a substantial proprietary stake in the enterprise, represented by either preferred or common stock of the transferee corporation or both to the extent of a material part of the value of the property transferred." Darrell, "Creditors' Reorganizations and the Federal Income Tax," 57 Harv.L.Rev. 1009, 1014 (1944). Although the landmark cases established a requirement that a "substantial" and "material" stock interest had to be retained, they did not prescribe any particular percentage of stock as being necessary to satisfy this requirement; nor indeed did they require retention of control, or the receipt of voting stock, by the proprietors of the old corporation. Pinellas Ice & Cold Storage Co. v. Commissioner, 1933, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428; John A. Nelson Co. v. Helvering, 1935, 296 U.S. 374, 56 S.Ct. 273, 80 L.Ed. 281; Helvering v. Minnesota Tea Co., 1935, 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284; LeTulle v. Scofield, 1940, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355.

In the original form of the "continuity of interest" concept, as laid down in the Pinellas case, supra, it was of course

the stockholders of the old corporation whose proprietary interest in it had to be traced into the required "substantial" and "material" stock interest in the acquiring corporation. However, in a group of cases decided together in February, 1942, the Supreme Court ruled that in an insolvency reorganization, "when the creditors took steps to enforce their demands against their insolvent debtor * * * they had effective command over the disposition of the property", and thus it was realistic to consider the creditors as the equity owners of the old corporation "when they invoked the processes of the law to enforce their rights of full priority. At that time they stepped into the shoes of the old stockholders." Helvering v. Alabama Asphaltic Limestone Co., 1942, 315 U.S. 179, 183–184, 62 S.Ct. 540, 543, 86 L.Ed. 775. In that case the creditors had instituted bankruptcy proceedings, but the Court also held that the particular legal process used to achieve "effective command" over the insolvent corporation's property was not significant. Palm Springs Holding Corp. v. Commissioner, 1942, 315 U.S. 185, 62 S.Ct. 544, 86 L.Ed. 785. Hence it followed that once the seizure of the equity interest by the creditors had occurred, it was not possible to find "continuity of interest" where the old shareholders, rather than the creditors, received the stock interest in the new corporation, as in fact had already been held in Mascot Stove Co. v. Commissioner, 6 Cir., 1941, 120 F.2d 153, certiorari denied, 1942, 315 U.S. 802, 62 S.Ct. 630, 86 L.Ed. 1202.

Meanwhile, in the Revenue Act of 1934 the Congress had tightened its definitions of a reorganization in § 112(g) (1) by enacting in certain instances requirements that the transferors must receive solely voting stock or 80 per cent control of the transferee corporation. Of course, where applicable, these new strict statutory definitions of reorganization had to be met in order for the transaction to receive a tax-free status, even though it did satisfy the judicially developed "continuity of interest" requirement. Helvering v. Southwest Consolidated Corp.,

1942, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789.

When Congress added § 112(b) (10) in the Revenue Act of 1943, the legislative history demonstrates what is quite obvious from the text of the Act, that the purpose was to eliminate the need for compliance with the strict reorganization definitions of § 112(g) (1) in the case of an insolvency reorganization occurring under control of a court. The legislative history also makes clear that the Congress then recognized the existence of the judicially developed "continuity of interest" test, and intended that test to be applicable in the administration of § 112(b) (10). The committee reports stated:

> "It is intended that only an actual reorganization of a corporation will be covered as distinguished from a liquidation in a bankruptcy proceeding and sale of property to either new or old interests supplying new capital and discharging the obligations of the old corporation. In other words, the type of transaction which was held not to be a reorganization under section 112(g) (1) in the Mascot Stove Co. case (120 F.2d 153) or in Templeton Jewelers, Inc. [Templeton's Jewelers, Inc. v. United States, 6 Cir.] (126 F.2d 251) would likewise not be covered under these amendments. * * *" S.Rep. No. 627, 78th Cong., 1st Sess. 50 (1943); H.R. Conf.Rep. No. 1079, 78th Cong., 2d Sess. 46 (1944).

The first sentence above quoted from the committee reports was carried into the Regulations [§ 29.112(b) (10)–1 of Regs. 111 is applicable to the tax years in question here]. In Chicago Stadium Corp., 1949, 13 T.C. 889, where all the new stock went to new interests, the validity of this provision of the Regulations was attacked. The Tax Court held that the provision correctly reflected the legislative intent to have the "continuity of interest" concept applied to § 112(b) (10). Accord, Davis v. Bankhead Hotel, Inc., 5 Cir., 1954, 212 F.2d 697.

In applying the "continuity of interest" test to a § 112(b) (10) situation, it must be borne in mind that we are dealing with a judge-made doctrine necessarily involving questions of degree, not a statutory prescription in terms of precise percentages. The purpose of the doctrine here is to preclude extension of so-called "tax-free status" to a transaction in which, as a result of insolvency or bankruptcy proceedings, the business is to be carried on by a new corporation which is predominantly in the proprietorship of interests other than the existing equity owners—which would be regarded as a closed transaction more in the nature of a sale. This is by way of contrast to a transaction in which, as a result of a reorganization by a court of equity, a sufficient proportion of the existing proprietary interests persists as such in what is a continuing enterprise under a modified corporate form. The important thing is the ultimate net effect of the transaction—here, the Goldsteins and Lares Theatres Corp., who represented 67 per cent of the creditor-owner interest just prior to the transfer, turned up as 100 per cent owners of the stock of the acquiring corporation as a result of the "package deal" stipulated in the Plan of Reorganization. Cf. United Gas Improvement Co. v. Commissioner, 3 Cir., 1944, 142 F.2d 216, 220; Liddon v. Commissioner, 6 Cir., 1956, 230 F.2d 304, 309.

There is ample precedent for the proposition that the requisite continuity of interest is established where as high as 67 per cent [1] of the prior equity interest receives an appropriate equity interest (here 100 per cent) in the acquiring corporation. E. g., Miller v. Commissioner, 6 Cir., 1936, 84 F.2d 415; Seiberling Rubber Co. v. Commissioner, 6 Cir., 1948, 169 F.2d 595; Reilly Oil Co. v. Commissioner, 5 Cir., 1951, 189 F.2d

382; Standard Coal, Inc., 1953, 20 T.C. 208. See also Holland, "Continuity of Interest in Nontaxable Reorganizations and Section 112(g) (1) (D)," 28 Taxes 434 (1950). This is a proper result, since it is typical of reorganizations that some minority of the proprietary interest may desire to get out of the enterprise, even at the cost of taking a fractional pay-off in cash. Nor does the change of proportionate proprietary interests itself preclude a finding of continuity. Seiberling Rubber Co. v. Commissioner, supra; The Robert Dollar Co., 1952, 18 T.C. 444. These were all cases where a group representing part of the prior equity interest had received, as in the present case, a substantially augmented equity interest in the new corporation. The Supreme Court has found continuity in what is indeed the more difficult case, where the prior interest is substantially reduced in percentage of ownership. Helvering v. Minnesota Tea Co., 1935, 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284; Palm Springs Holding Corp. v. Commissioner, 1942, 315 U.S. 185, 62 S.Ct. 544, 86 L.Ed. 785.

Another argument by the Commissioner relates to the form in which the prior 67 per cent of the creditor-owner interest received its 100 per cent stock interest in the petitioner corporation. It will be recalled that in the reorganization plan the G. B. Bonds were exchanged for bonds of the acquiring corporation on a dollar-for-dollar basis. This of course not only included the bonds owned by the Goldsteins and Lares Theatres Corp. but also the bonds held by others, who did not participate in the continuing business as stockholders. In addition, the Goldsteins and Lares Theatres Corp. gave to petitioner cash loans, leases, and equipment, and agreed to management and service contracts. Petitioner gave to the Goldsteins and Lares Theatres Corp. its notes, its

---

1. The Commissioner does not seem to make anything of the point that at the date of the institution of the receivership proceedings the Goldsteins and Lares Theatres Corp. had only 36 per cent of the G.B. Bonds. Here the further interim purchases of bonds were made by the Goldsteins, who were members of the eligible group from the beginning. It might have been different if those interim purchases had been made by outsiders, who then sought to use the identity of the former owners to sustain the "continuity of interest."

agreement to pay under the management and service contracts, the deficiency claim against Olympia, and all of its stock. The argument of the Commissioner, in this connection, is founded upon the supposition that, for continuity of interest to be established, the prior equity owners (the Goldsteins and Lares Theatres Corp. as bondholders) must have received their new equity interest in the acquiring corporation in their "capacity" as such prior equity owners. On this premise, which is not based upon the language of the statute, the Commissioner contends that the Goldsteins and Lares Theatres Corp. received only bonds of petitioner in their capacity as G. B. bondholders, just as did the other G. B. bondholders, but that the Goldsteins and Lares Theatres Corp. must have received petitioner's stock in exchange for the other considerations furnished by them to petitioner, including especially the new cash which these particular G. B. bondholders were willing to contribute to the continuing business. But we do not think that the premise upon which the foregoing argument is based is well founded. Goldstein Brothers, Inc., 1955, 23 T.C. 1047, 1051, affirmed 7 Cir., 1956, 232 F.2d 566. Cf. Commissioner of Internal Revenue v. Huntzinger, 10 Cir., 1943, 137 F.2d 128; Prairie Du Chien-Marquette Bridge Co. v. Commissioner, 3 Cir., 1944, 142 F.2d 624; The Robert Dollar Co., 1952, 18 T.C. 444; The South Coast Corp., 4 C.C.H.Tax Ct.Mem. 623 (1945), affirmed 5 Cir., 1947, 162 F.2d 589. No doubt by reason of the fact that the Goldsteins and Lares Theatres Corp. held G. B. Bonds, and thus were implicated in the fortunes of the business, these particular bondholders were willing to furnish needed new capital for continuing the business in modified corporate form; and thus, in a realistic sense, it might be said that the Goldsteins and Lares Theatres Corp. received their stock interest in petitioner "by reason of" their prior equity interest. This would comport with the formulation of the "continuity of interest" concept in the leading case

of Mascot Stove Co. v. Commissioner, 6 Cir., 1941, 120 F.2d 153, 155, certiorari denied, 1942, 315 U.S. 802, 62 S.Ct. 630, 86 L.Ed. 1202, to the effect that the prior equity owners must receive their stock interest in the acquiring corporation "by reason of, or in exchange for their interest in the transferor." In the present case the Tax Court made what we believe was an unjustified change from "or" to "and" in this formulation of the continuity of interest requirement by laying down that the new proprietary interest must be received "by reason of, and in exchange for, their interest in the transferor." See Goldstein Brothers, Inc., supra.

■ Nor do we think that the Commissioner can rest his case for lack of continuity of interest upon the provision of the Regulations that § 112(b) (10) does not apply to a "sale of property to either new or old interests supplying new capital." Regs. 111, § 29.112(b) (10)–1. As we have seen, this language in the Regulations was taken directly from the committee reports issued at the time § 112(b) (10) was being enacted. Again quoting from the crucial language of the reports:

> "It is intended that only an actual reorganization of a corporation will be covered as distinguished from a liquidation in a bankruptcy proceeding and sale of property to either new or old interests supplying new capital and discharging the obligations of the old corporation. In other words, the type of transaction which was held not to be a reorganization under section 112(g) (1) in the Mascot Stove Co. case (120 F.2d 153) or in Templeton Jewelers, Inc. (126 F.2d 251) would likewise not be covered under these amendments. * * *" S.Rep. No. 627, 78th Cong., 1st Sess. 50 (1943); H.R.Conf.Rep. No. 1079, 78th Cong., 2d Sess. 46 (1944).

We assume the Commissioner would concede that the language of the Regulations means the same as identical words in the committee reports from which the

language obviously was taken. It is perfectly clear what the committee reports meant by "old interests supplying new capital," for in the very next sentence the reports go on to explain that, "In other words, the type of transaction which was held not to be a reorganization under section 112(g) (1) in the Mascot Stove Co. case * * * or in Templeton Jewelers, Inc., * * * would likewise not be covered under these amendments." The two cases thus cited in the reports were ones in which the new equity interest went to stockholders of the old corporation whose former equity had been extinguished in favor of creditors at the time of the reorganization. Thus the reference in the committee reports and the Regulations to "new or old interests" must be understood as meaning "new or *former* interests." Just as there is no continuity of interest if the stock of the acquiring corporation goes to a new party who supplies additional capital, so too there is no continuity of interest if the new stock goes to "old" or "former" interests who must be said to receive the new stock "in exchange for or by virtue of" the new capital only, since at the time of the transfer they have no equity interest at all in the assets being transferred. Goldstein Brothers, Inc., 1955, 23 T.C. 1047, affirmed, 7 Cir., 1956, 232 F.2d 566; Detroit-Michigan Stove Co. v. United States, 1954, 121 F.Supp. 892, 128 Ct.Cl. 585. See also Wells Fargo Bank & Union Trust Co. v. United States, 9 Cir., 1955, 225 F.2d 298. In applying the Regulations, therefore, the Commissioner is in error in referring to the Goldsteins and Lares Theatres Corp. as "old interests" in the instant case. They were not "former" interests, but present interests, with respect to the equity ownership of the property transferred to the petitioner in this reorganization, a distinction which was quite clearly made in Standard Coal, Inc., 1953, 20 T.C. 208.

Since the furnishing of some new capital is almost invariably needed in an insolvency reorganization, few such reorganizations could qualify for tax-free status if the appearance of new capital reflected in the new equity interest were automatically to destroy "continuity of interest." Such an effect would seem especially contrary to legislative intent with regard to § 112(b) (10), passed as a relief measure in response to the existence of artificial distinctions inhibiting tax-free status for some insolvency reorganizations. See H.R.Conf.Rep. No. 1079, 78th Cong., 2d Sess. 45–46 (1944). See also Standard Coal, Inc., 1953, 20 T.C. 208; Realty Corp., 5 C.C.H. Tax Ct. Mem. 868 (1946). The Commissioner in his brief does concede that "some new capital may come into the business and be reflected by some part of the new stock interest" without sacrifice of the requisite continuity of interest. But the Commissioner points out that in the present case the minority G. B. bondholders who owned a part of the proprietary interest in the property transferred were, under the Plan of Reorganization, barred from receiving any new equity interest in the acquiring corporation. That is to say, the Commissioner argues that, even if it is acceptable to have less than 100 per cent participation by the prior equity owners, and even if there may be some reshuffling of proportionate interests to reflect new capital given by some of them, there can be no continuity of interest unless 100 per cent of the prior equity owners at least had the option, under the reorganization plan, of acquiring a stock interest in the new corporation.

■■ Of course it is not our present concern whether the Plan of Reorganization, approved by the state equity court, was fair and equitable. For all we know, it may be that only the Goldsteins and Lares Theatres Corp. were willing to furnish additional capital to the continuing business, and that the Plan of Reorganization may have been drafted on that basis. At any rate, since it is the effect of the reorganization which is the important thing, we do not see that it makes any difference, for present purposes, whether the minority of the G. B. bondholders chose to be bought out, or

were frozen out, under the reorganization plan, since in either case an acceptable and dominant percentage of the old equity interests were carried forward as proprietors of the continuing business in the modified corporate form. Cf. Miller v. Commissioner, 6 Cir., 1936, 84 F.2d 415; Seiberling Rubber Co. v. Commissioner, 6 Cir., 1948, 169 F.2d 595. It may be that where the minority is frozen out, there should be a requirement of a greater percentage of the former owners carried forward with the continuing business. Most likely that refinement should be left to legislative prescription. However that may be, it seems to us that maintaining in solution two-thirds of the prior equity interest should be sufficient in any case.

The decision of the Tax Court is vacated, and the case is remanded for entry of an appropriate decision in conformity with this opinion.