**REEF CORPORATION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**REEF CORPORATION, Respondent.**

No. 22836.

United States Court of Appeals Fifth Circuit.

Oct. 25, 1966.

Rehearing Denied Dec. 15, 1966.

Bell, Circuit Judge, dissented in part.

Homer L. Bruce, William C. Griffith, Robert J. Piro, Houston, Tex., for petitioners. Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel.

Mitchell Rogovin, Chief Counsel, I. R. S., John B. Jones, Jr., Act. Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Hu S. Vandervort, Jr., Atty., I. R. S., Richard M. Roberts, Act. Asst. Atty. Gen., Harry Baum, Fred R. Becker, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before RIVES and BELL, Circuit Judges and FULTON, District Judge.

BELL, Circuit Judge.

This appeal is from a decision of the Tax Court reported as Reef Corporation v. Commissioner, T.C.Memo. 1965–72 and CCH Dec. 27309(M). It involves income taxes. Reef Corporation appeals from the disallowance of a stepped-up basis of depreciation, and of interest on corporate indebtedness. The Commissioner, by way of a cross-appeal, contends that the Tax Court erred in not holding that the transaction which is the subject matter

of the litigation constituted a corporate reorganization under § 368(a) (1) (F) of the Internal Revenue Code of 1954, as amended. 26 U.S.C.A. § 368(a) (1) (F). Additional taxes would be due under such a holding. We affirm the Tax Court on the appeal and reverse on the cross-appeal.

The facts giving rise to the controversy must be stated in some detail to form a frame of reference for the questions to be decided. Reef Fields Gasoline Corporation (Reef Fields) was organized as a Texas Corporation on July 30, 1951 to operate a casinghead gas plant. It was formed by two groups of people, hereinafter known as the Butler group and the Favrot group. The Butler group operated the company. The Favrot group had no operational responsibilities. The Butler group owned 21,328 shares of the 40,800 outstanding shares of common stock in the corporation and the Favrot group owned the remaining 19,472 shares.

In 1958 the Butler group determined to buy out the Favrot group. After discussions between the groups, a plan was formulated whereby the stockholders of Reef Fields would approve a plan of liquidation whereunder Reef Fields would sell its operating assets to a new corporation to be formed in exchange for cash and notes of the new corporation. The Favrot group would receive cash and notes while the Butler group would receive only notes. The Butler group rejected this plan after seeking legal advice and learning that the transaction would result in the payment of taxes by them when they were in fact receiving no cash with which to pay the taxes.

An alternative plan was devised and executed. The Butler group formed Reef Corporation (new Reef) under Delaware law on December 15, 1958. They received all of the common stock of new Reef in exchange for a portion of their stock in Reef Fields. On the same day Reef Fields contracted to sell its properties to new Reef for its notes. All of the stock in Reef Fields was to be sold to a third party who was, in turn, to carry out the sale of the assets of Reef Fields

to new Reef. To accomplish this the Favrot group then sold all of its Reef Fields stock to the third party, George Strong, Trustee, a Houston attorney, taking his notes in exchange therefor. As part of the plan, these notes were to be repaid by Strong as payments were made to him by new Reef. The Favrot group also received cash from Strong which was made possible by a simultaneous loan to him from Reef Fields. The cash came from the proceeds of a long-term life insurance company loan which was made contemporaneously by Reef Fields and assumed at the end of the transaction by new Reef. Some of the proceeds of the loan were used to pay prior loans of Reef Fields. Next, the Butler group sold their remaining shares in Reef Fields to Strong in return for his notes. New Reef then sold its Reef Fields stock which had been obtained from the Butler group to Strong in return for the notes of Strong and this placed all of the stock of Reef Fields in Strong. The next step was the acquisition of Reef Fields assets by new Reef, and the assumption by new Reef of the liabilities of Reef Fields. New Reef issued its notes to represent its indebtedness to Reef Fields. Reef Fields then distributed the notes received from new Reef together with cash on hand to Strong, its sole stockholder. Strong pledged the Reef Corporation notes to the Butler group, Favrot group and new Reef, respectively, pro rata for the stock sold to him and he was relieved of any liability on his personal notes. Reef Fields was dissolved on April 27, 1959. This plan was satisfactory to the Butler group because the taxes due on the sale of Reef Fields stock was payable on an installment basis as payment was received from Strong.

Strong had business connections with the Favrot group and received only nominal consideration for his services. His entire role was to execute one part in an overall plan to redeem the stock of the Favrot group to the end that sole control of the business of Reef Fields would be vested in the Butler group. The business which had been operated by Reef Fields

until February 28, 1959 when its properties were formally transferred to new Reef continued to be operated without interruption by new Reef. The management and the employees were the same, and even the pension-trust and profit-sharing plans of Reef Fields were transferred to and adopted by new Reef.

Reef Fields, which filed its income tax returns on an accrual basis and whose fiscal year ran from July 1 to June 30, filed an income tax return for the short taxable period July 1, 1958 to the date of dissolution, April 27, 1959. It reported a non-taxable gain on the sale of its properties to new Reef and claimed a deduction for reincorporation expenses. The Commissioner disallowed the return on the basis that new Reef was the successor in name to Reef Fields and thus the return should have been for the full fiscal year. This position, rejected by the Tax Court, was based on the premise that the transaction resulted in a reorganization under § 368(a) (1) (F).

Reef Corporation (new Reef), the petitioner, which had adopted the accrual method and the July 1 to June 30 fiscal year, filed an income tax return covering the short period December 15, 1958, the date of its incorporation, to June 30, 1959. The sum of $66,208.75 was deducted as interest payments on the new Reef notes payable to Strong for repayment to the Butler group. Depreciation was computed on the basis of the cost of the assets to new Reef and not on the basis of the cost of the assets to Reef Fields. The Tax Court disallowed the interest payments, and held that the depreciation basis was the cost of the assets to Reef Fields.

There are three assignments of error by petitioner. It is contended that the Tax Court erred in refusing to recognize the sale by the various Reef Fields stockholders to Strong; in concluding that the tranaction in question was a reorganization under § 368(a) (1) (D) with the result that new Reef did not receive a stepped-up basis on the assets purchased from Reef Fields for depreciation purposes; and in disallowing the interest paid to Strong by new Reef to the extent that the payment covered interest due on Strong's notes to the Butler group for the reason that the sums on which the interest was paid constituted capital or an equity investment rather than debt.[1] The Commissioner contends on his appeal that the Tax Court erred in holding that the transaction did not constitute a reorganization under § 368(a) (1) (F), and in thus holding that the notice of deficiency to petitioner as the successor in name to Reef Fields Gasoline Corporation for a full fiscal year was invalid.

I.

Petitioner's first contention, if sustained, would carry the day and obviate the necessity of considering the errors assigned on the basis of the corporate reorganization statute, § 368(a) (1) (D) and (F). 26 U.S.C.A. § 368(a) (1) (D) and (F). If the sale to Strong by the Reef Fields stockholders is considered bona fide for tax purposes, and the sales contract between the corporations disregarded, the subsequent sale to new Reef might result in new Reef being entitled to a stepped-up basis for depreciation. 26 U.S.C.A. §§ 167(f), 1011, 1012.

 We affirm the holding of the Tax Court insofar as it disregarded the

---

1. In addition to the other errors assigned, petitioner claims that in any event it was entitled to deduct the interest payment differential between what Strong paid as interest on his notes given to new Reef for the Reef Fields stock, and what new Reef paid to Strong on its notes which had been given for the assets. The difference was one fourth of one per cent and amounted to $598.75 to Strong for the period under consideration. This differential is in the nature of a service charge by or payment to Strong but it is part and parcel of the method chosen for the purpose of redeeming the Favrot stock and attempting to obtain a stepped-up basis of depreciation and the Butler group interest deductions. As will be seen in our further discussion, the role of Strong is being disregarded for tax purposes. It follows that the interest differential paid to Strong was not deductible.

role of Strong without further discussion. He was a mere conduit in a preconceived and prearranged unified plan to redeem the stock of the Favrot group in Reef Fields. His activity was but a step in the plan. He carried out a sales contract already entered into between the corporations. He assumed no risk, incurred no personal liability, paid no expenses and obtained only bare legal title to the stock. There was an insufficient shifting of economic interests to Strong. It is settled that under such circumstances substance must be given effect over form for federal tax purposes. The holding of the Tax Court in this regard was not clearly erroneous. Cf. Commissioner of Internal Revenue v. Court Holding Company, 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Hindes v. United States, 5 Cir., 1964, 326 F.2d 150; United States v. General Geophysical Company, 5 Cir., 1961, 296 F.2d 86; Pebble Springs Distilling Company v. Commissioner of Internal Revenue, 7 Cir., 1956, 231 F.2d 288. And see Davant v. Commissioner of Internal Revenue, 5 Cir., 1966, 366 F.2d 874, decided this date, where we disregarded a sale to a third party brought in merely to serve as a conduit between two corporations having the same stockholders in the sale of assets by one to the other.

New Reef places primary reliance on the case of Commissioner of Internal Revenue v. Brown, 1965, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75. That case, however, is distinguishable. There was arm's length bargaining by the intermediate purchaser in that transaction, here there was not; the intermediate purchaser there acquired unfettered ownership and here Strong did not. Strong was in effect acting to service a contract rather than as a purchaser.

II.

██ This brings us to the contention of petitioner that the Tax Court erred on the depreciation question in holding that the transaction resulted in a corporate reorganization under § 368(a) (1) (D).[2] In general the reorganization sections of the Code, §§ 351 through 381, are designed to permit certain corporate changes and adjustments to be made without tax consequences to the participating corporation or corporations or their shareholders. The congressional policy is that while such transactions may produce changes in the conduct of the business enterprise or in ownership, these changes are not sufficiently significant to warrant taxing the gain or allowing the loss which comes about by reason of the change. Here, the transfer of assets from Reef Fields to new Reef was non-recognizable for the purposes of taxation. On the other hand, a corollary to nonrecognition of gain or loss under this policy requires the carryover of the basis of corporate assets. This insures that any gain or loss realized but not recognized will not escape taxation but is simply deferred.

Petitioner here contends that the old asset basis for purposes of depreciation should give way to a stepped-up basis computed on the cost of the assets to new Reef. Section 362(b) of the Code, 26 U.S.C.A. § 362(b), requires that petitioner's basis in the assets, if this was a reorganization, shall be the same as their basis in the hands of Reef Fields. The Tax Court was of the view that the transaction between Reef Fields, Strong, and

2. § 368. *DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.*

(a) *Reorganization.*—

(1) *In general.*—For purposes of parts I and II and this part, the term "reorganization" means—

\* \* \* \* \*

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more

of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

new Reef meets the definition of a reorganization set out in § 368(a) (1) (D).

The statute first requires a transfer by Reef Fields of all or a part of its assets to new Reef. This condition was met. The statute requires that immediately after the transfer one or more of the shareholders in Reef Fields, who were shareholders immediately before the transfer, be in control of new Reef. The Butler group was in control of new Reef. However, unless Strong is to be ignored, they were not shareholders immediately before the transfer of the assets because their stock had been conveyed to Strong in part and to new Reef in part. We conclude, as did the Tax Court, that Strong is to be disregarded for the purposes of this statute. The same reasoning applied in Part I of this opinion for not finding a bona fide sale applies equally here. Strong was a mere conduit for carrying out a prearranged plan and his role is of no significance in determining the tax consequences of the transaction.

But this is not the end of the matter. The statute also provides that pursuant to the plan of reorganization, and there was definitely a plan here, the stock or securities of the corporation to which the assets are transferred (new Reef) be distributed in a transaction which qualifies under § 354, 355 or 356 of the Code. 26 U.S.C.A. §§ 354, 355, 356. Only § 354 [3] is pertinent here. Section 356 is the "boot" section applicable to either a § 354 or a § 355 situation.

Section 354(a) (1) requires the exchange of stock or securities in Reef Fields for stock or securities in new Reef. Disregarding Strong, here the Butler group exchanged some of their Reef Fields stock for all of the new Reef stock and the balance of their Reef Fields stock for new Reef securities (notes). Thus the Butler group has complied with this requirement. The Favrot group also complied by transferring their stock for new Reef notes via Strong.

We must also find compliance with § 354(b) (1) (A) and (B). Subsection (A) requires that new Reef must have acquired substantially all of the assets of Reef Fields and the Tax Court found this to be the fact. Petitioner urges that $1,217,000 in cash was distributed to the Favrot group and therefore "substantially all of the assets" of Reef Fields were not transferred to new Reef. However, eliminating this cash, approximately eighty per cent of the assets of Reef Fields were transferred to new Reef and this is a sufficient basis for the finding by the Tax Court.

Subsection (B) requires that the stock, securities or other properties received by Reef Fields must have been distributed pursuant to the plan of reorganization. This requirement was also met. The notes of new Reef were received by Reef Fields and distributed by Reef Fields to

---

3. SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

 (a) *General Rule.*—

 (1) *In General.*—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

 (2) *Limitation.*—Paragraph (1) shall not apply if—

 (A) the principal amount of any such securities received exceeds the principal amount of any such securities surrendered, or

 (B) any such securities are received and no such securities are surrendered.

 (3) Cross reference—

 * * * * *

 (b) *Exception.*—

 (1) *In general.*—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a) (1) (D), unless—

 (A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

 (B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

its shareholders via Strong. Here again we disregard Strong's participation for tax purposes. The statute cannot be avoided by such a strawman procedure. We read subsection (B) as requiring that whatever is received by Reef Fields, stock, securities and property, be distributed. Only securities were received and they were indeed distributed.

These statutory tests make redundant two general requirements which must be present if the reorganization statutes are to be applied. There must be continuity of interest between Reef Fields and new Reef, Cortland Specialty Co. v. Commissioner of Internal Revenue, 2 Cir., 1932, 60 F.2d 937, and also a continuity of business enterprise between the two, Becher v. Commissioner of Internal Revenue, 2 Cir., 1955, 221 F.2d 252. The continuity of interest was present here through the Butler group, and the continuity of business enterprise was present since new Reef carried on the same business as Reef Fields. See Mertens, Law of Federal Income Taxation, §§ 20.55, 20.91.

This was clearly a corporate reorganization within the meaning of § 368(a)(1) (D) and, accordingly pursuant to § 362(b), new Reef's basis in the corporate assets is the same as it was in the hands of Reef Fields. The Tax Court was correct in so holding.

### III.

The last contention of petitioner to be considered is whether the Tax Court erred in sustaining the disallowance by the Commissioner of the interest paid by new Reef to Strong and, in turn, by Strong to the Butler group on the notes received for the Reef Fields assets. These assets were sold to new Reef by Reef Fields and the notes received by Strong for the Butler group represented that portion of the purchase price which their shares in Reef Fields bore to the whole purchase price. The transaction began with the Butler group owning 21,328 shares and the Favrot group owning 19,472 shares of the 40,800 shares of Reef Fields common stock outstanding.

The Butler group transferred 3,832 of its shares in Reef Fields to new Reef for all of the stock in new Reef, thus leaving 17,496 shares of the Reef Fields stock in the Butler group.

The sum of these transactions is that new Reef had a capitalization of $500,000 represented by the 3,832 shares of Reef Fields stock. Again disregarding the role of Strong, Reef Fields issued $2,920,000 in notes and cash to the Favrot group for its proprietary interest, 19,472 shares. New Reef notes were issued to the Butler group totalling $2,624,400 for their 17,496 shares of stock in Reef Fields.

The result was that the stock of the Favrot group was redeemed; and 17,496 shares of the total of 21,328 shares owned by the Butler group was converted into debt through the medium of the new Reef notes. This too was a redemption albeit a delayed redemption. The debt was then set up on a basis whereby new Reef would deduct the interest paid to the Butler group on the debt and this, to us, is a transparent dividend.

■ In addition to the drastic reduction in capital which came about in the transmutation between Reef Fields and new Reef, there is one other factor which strongly indicates that the sums due the Butler group on the new Reef notes was intended to serve as risk capital. The Favrot group received a large payment in cash, in fact approximately forty-two percent of the value of their stock. This came from a life insurance company loan. The Butler group received no cash. All of the notes issued by new Reef for the assets were subordinated to the $3,000,000 loan due the life insurance company. Except in the event of excess earnings, no payments would be made on the notes until the large insurance loan was paid off nearly seven years later. The notes would then be paid off on an installment basis over a period of several additional years. Thus the new Reef notes due the Butler group, sole owners of new Reef, represented debt to be used at the risk of the business in that it was deferred to the business.

These facts are sufficient to sustain the Tax Court. In addition to the Favrot redemption, we have, in effect, a substantial redemption of the Butler interest in Reef Fields through a debt process. But the debt, under the circumstances, is risk capital and petitioner may not deduct the interest payments received by those furnishing the risk capital. See Montclair, Inc. v. Commissioner of Internal Revenue, 5 Cir., 1963, 318 F.2d 38 and cf. Rowan v. United States, 5 Cir., 1955, 219 F.2d 51. See also Mertens, Law of Federal Income Taxation § 26.10c.

Starting with the business purpose of redeeming the stock of the Favrot group in Reef Fields, we end up with a step transaction whereby some hope was at least engendered of obtaining a stepped-up depreciation basis and interest deduction in lieu of dividends. We have a business purpose combined with an impermissible contrivance to avoid taxes. Cf. Gregory v. Helvering 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355. There is no merit in the contentions of petitioner.

IV.

The court is unanimous with respect to what has heretofore been said. Still left for consideration, however, is the cross-appeal of the Commissioner. It is his contention that the Tax Court erred in failing to hold that the transaction resulted in a corporate reorganization within the scope of § 368(a) (1) (F).[4] His position is that no more took place than a mere change in identity, form, or place of organization of Reef Fields. Judges Rives and Fulton are of the view that this contention should be sustained. This means that the notice of deficiency sent to petitioner as the successor in name to Reef Fields will be validated and

a remand will be necessary so that the Tax Court may consider the Commissioner's position under that deficiency notice.

The Commissioner sent two statutory notes of deficiency as a protective measure. One notice, addressed to "Reef Corporation (successor in name to Reef Fields Corporation)", was based on the position that new Reef, although a new corporate entity, was the same taxable entity as Reef Fields. The deficiency under this notice was claimed to be $111,894.40. The other notice, addressed to "Reef Corporation", treated new Reef as a new taxable entity to file a return covering the short taxable period but the depreciation and interest deductions were disallowed, as stated, and the additional tax due was claimed to be $70,695.18.

The Tax Court rejected the Commissioner's position with respect to § 368(a) (1) (F), and thus the deficiency notice to petitioner as successor in name to Reef Fields was invalid. As noted, the Tax Court did adopt the Commissioner's alternative position that the transaction resulted in a corporate reorganization under § 368(a) (1) (D), and concluded that the assets transferred by Reef Fields to new Reef had a substituted basis for depreciation and not a stepped-up basis.

The reasoning which supports the conclusion of Judges Rives and Fulton that this is a § 368(a) (1) (F) reorganization follows.

In concluding that the instant case was not a type (F) reorganization, the Tax Court interpreted the Supreme Court's last sentence in Helvering v. Southwest Consolidated Corporation, 1942, 315 U.S. 194, 202, 203, 62 S.Ct. 546, 86 L.Ed. 789,[5] as holding § 368(a) (1) (F) is "inapplicable when there is a shift in proprietary interest." Southwest Consolidated was

4. § 368. *DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.*
 (a) Reorganization.—
 (1) *In general.*—For purposes of parts I and II and this part, the term "reorganization" means—
 * * * * *

(F) a mere change in identity, form, or place of organization, however effected.

5. Hereafter cited as Southwest Consolidated.

decided under the 1939 Internal Revenue Code, and we think that the complete revision of the Code in 1954 compels a different result under the instant circumstances from that reached in *Southwest Consolidated*. Further, this case is distinguishable on its facts from *Southwest Consolidated*.

## A.

The intricate and confusing facts of this case have been carefully explained. Distilled to their pure substance, two distinct and unrelated events transpired. First, the holders of 48% of the stock in Reef Fields had their stockholdings completely redeemed. Second, new Reef was formed and the assets of Reef Fields were transferred to new Reef. The business enterprise continued without interruption during both the redemption and the change in corporate vehicles.

Much confusion flows from the fact that the corporate reorganization took place simultaneously with the stock redemption. But taking the Code as a standard, these two elements were functionally unrelated. Reef Fields could have completely redeemed the stock of 48% of its shareholders without changing the state of its incorporation. A complete redemption is not a characteristic of a reorganization. Congress clearly indicated this when it defined reorganization in section 368. Sections 368(a) (1) (A) speaks of a "merger or consolidation" which looks to the joining of two or more corporations. Section 368(a) (1) (B) and (C) look to one corporation acquiring the assets of another or control of another corporation solely for its voting stock. Section 368(a) (1) (D) looks to the consolidation of two or more corporations or the division of two or more going businesses into separate corporations. Only sections 368(a) (1) (E) and (F) look to adjustments within a corporation. But none of these provisions focuses on a complete redemption as a characteristic of a reorganization. Congress did not have redemption of stock as a primary purpose of any of the forms of a reorganization. That subject came under consideration when it undertook to enact specific legislation on complete and partial redemptions, section 302.

■ The boot provision, section 356, is adequate to cover a complete redemption when it occurs incident to a reorganization whose primary purpose conforms to the intent of section 354 or 355. But section 356 was principally designed to cover dividends incident to a reorganization. When the primary characteristics of the reorganization conform to those described by 368(a) (1) (F), we should parse the occurrences into their functional elements. The reorganizational characteristics present in the instant case do not conform to those generally intended to be covered by section 354, as applied to section 368(a) (1) (D), and therefore we should not be blinded by the 356 boot provision. To effectuate the intention of Congress manifested in the Code, we must separate this transaction into its two distinctly separate functional parts. The test of whether events should be viewed separately or together as part of a single plan is not temporal but is functional. See Davant v. Commissioner of Internal Revenue, 5 Cir.1966, 366 F. 2d 874. Applying this test to the instant case, it is clear that the redemption and the change of corporate vehicles must be viewed as separate and distinct occurrences. Cf. Bazley v. Commissioner of Internal Revenue, 1947, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782, 173 A.L.R. 905.

## B.

■ In 1954 Congress completely overhauled the sections of the Code detailing the tax consequences of many types of corporate transactions.[6]

---

6. The House Report accompanying H.R. 8300, 1954 U.S.Code Cong. & Admn.News 4017, 4059, said:

"Your committee has carefully considered existing law with respect to all of these corporate and intercorporate transactions. As a result your committee's bill represents a complete structural overhaul of existing law in this area. Your committee's bill has had three basic objectives. First, it has endeavored to make existing law

Grouped together by Congress were the sections dealing with corporate distributions and adjustments, including the sections dealing with partial liquidations, stock redemptions (complete or partial), and corporate reorganizations.[7] As we said in Davant v. Commissioner of Internal Revenue, 5 Cir.1966, 366 F.2d 874 at 879: "In order to effectuate the intent of Congress the dividend, liquidation, redemption and reorganization sections of the Code must be examined and viewed as a functional whole."

Prior to 1954 Congress had not specifically provided for the tax treatment of partial liquidations or redemptions. This problem had been handled by judicial decisions which caused "considerable confusion" and in some cases resulted in "unwarranted" taxes and in others allowed taxpayers to "avoid" proper taxation.[8] To correct this situation, Congress enacted a comprehensive set of rules governing the complete and partial redemptions of a stockholder's interest in a corporation. Section 302.

In the instant case the only way to protect the statutory intent of Congress is to test the redemption of stock by the provisions of section 302. A similar result as to the stockholders comes from applying sections 368, 354 and 356. But this method may not always reach the

same result and in the instant case would cause an improper result with regard to the corporation. Since the reorganization and the redemption are functionally unrelated in this case, the redemption should be tested by the standard Congress has laid down in section 302.

Prior to 1954 Congress had not specifically provided which tax attributes should be carried over to the surviving or new corporation remaining after a reorganization.[9] "These include such items as loss carry overs, unamortized bond discount, installments sales reporting, LIFO inventory method, and earnings and profits."[10] These adjustments had been left to judicial interpretation. In addressing itself to this problem, the House Committee said (1954 U.S.Code Cong. & Admn.News at 4066):[11]

"As a result, present practice rests on court-made law which is uncertain and frequently contradictory. Moreover, whether or not the carryover is allowed should be based upon economic realities rather than upon such artificialities as the legal form of the reorganization."

The Senate Committee explained that under the new section 381 (1954 U.S. Code Cong. & Admn.News at 4684):

"Tax results of liquidations or reorganizations are thereby made to de-

more certain by redrafting existing provisions so as to clarify their meaning, and by supplying statutory provisions where none now exist. Second, your committee's bill is designed to provide for nonrecognition of gain or loss in cases which involve a mere rearrangement of the corporate structure or other shifts in the form of the corporate enterprise which do not involve any distribution of corporate assets to shareholders. These provisions, like those in existing law, are designed to insure that the full tax will be imposed through the operation of the basis provisions when there is such a realization. Third, your committee's bill is designed to make impossible a number of tax avoidance devices which exist under the present statute and have received the sanction of court decisions."
While the Senate eliminated certain portions in the House bill, it still sought to tie corporate taxation to "substance" not

"form." 1954 U.S.Code Cong. & Admn. News 4621, 4672–4674; Conference Report, 1954 U.S.Code Cong. & Admn.News 5280, 5293–5294, 5298–5299.

7. Both the House and the Senate treated "Corporate Distributions and Adjustments" as a single integrated tax system designed to function as a unit. 1954 U.S. Code Cong. & Admn.News at 4020, 4058–4071, 4624, 4672–4689. Included among these provisions were sections 302, 354, 368, 381.

8. 1954 U.S.Code Cong. & Admn.News 4017 (House Rep.) at 4060. See similarly the Senate Report, ibid, at 4675.

9. 1954 U.S.Code Cong. & Admn.News at 4066, 4683.

10. 1954 U.S.Code Cong. & Admn.News (Senate Rep.) at 4683. See similarly the House Report, ibid, at 4066.

11. See similarly 1954 U.S.Code Cong. & Admn.News (Senate Rep.) at 4683.

pend less upon the form of the transaction than upon the economic integration of the two or more separate businesses into a unified business enterprise. At the same time the new provision makes it difficult to escape the tax consequences of the law by means of a legal artifice such as liquidation and reincorporation or merger into another corporation."

Thus, in 1954, in order to correct the existing problems created by unrealistic and conflicting judicial decisions, Congress enacted a comprehensive set of rules governing the carry-over of tax attributes from one corporation to another as a result of a reorganization. Section 381.

In section 381 Congress made a rational distinction between reorganizations that constitute a mere change in form and those that integrate two previously separate and independent enterprises. Where two or more separate businesses are unified into a single enterprise under a 368(a) (1) (D), 354 reorganization, Congress recognized that the resulting new enterprise should be allowed to change certain of its accounting procedures. See for example section 381(b). But Congress also realized that when the business enterprise is carried on as before, with no change in its substance, this is not a proper time to allow the business to change its accounting procedures. See for example 381(b).[12] Thus for the first time, in 1954 it became important to determine whether a reorganization was considered a (D) type or an (F) type reorganization.[13]

Virtually all (F) reorganizations also qualify as (D) reorganizations.[14] When a transaction qualifies as both an (F) and a (D) reorganization, if the new entity were governed by the less stringent continuity rules of (D) reorganizations, provided by section 381, the (F) rules would become a dead letter. The (F) rules are stricter than the (D) rules because a mere change of corporate charter or state of incorporation is not the proper occasion for wholesale accounting method changes that would not have been permitted if no reorganization had taken place.

Only those reorganizations which reflect a substantial change in the corporate operation should be viewed as *solely* (D) reorganizations qualifying for the more liberal rules. Where there is no substantial change in the corporate operation, (F) should be applied since it invokes the stricter rules.

In the instant case there has been no substantial change in the operation of the corporate business. It is carried on just as before but in a new corporate vehicle. This is not a 354 "integration of two or more separate businesses into a unified business enterprise," which Congress considered when it adopted the more liberal rules applicable to a (D) reorganization.

What characteristics of reorganization are present in this case? The only characteristics of a corporate reorganization are the changes in name and state of incorporation. Those are primarily the characteristics of an (F), not a (D), reorganization. The redemption is not a characteristic of a reorganization, as is

12. Section 381(b) excludes type (F) reorganizations from the liberal treatment accorded type (D) reorganizations.

13. Whether a reorganization is only a (D) type or also qualifies as an (F) type reorganization is also important in applying section 1244. Section 1244(d) (2) applies different rules to an (F) type reorganization than are applied to an (A), a (C) or a (D) reorganization.

14. In its revision of the Code, the House Committee "deleted as unnecessary" section 368(a) (1) (F). 1954 U.S.Code Cong. & Admn.News at 4253. The Senate Committee restored that provision (1954 U.S.Code Cong. & Admn.News (Senate Rep.) 4621, 4911), however, noting that "section 354 provides rules for exchanges by shareholders and security holders in reorganizations described in sections 368(a) (1) (A), (B), (C), (E), and (F)." 1954 U.S.Code Cong. & Admn. News at 4903. Thus, the fact that the instant reorganization qualifies under 354 does not mean that it is not also an (F) type reorganization.

demonstrated by the fact that a redemption standing alone would not allow a corporation to make wholesale changes in its method of accounting.

If a corporation did no more than completely redeem the stock interest belonging to 48% of its shareholders, it could not under the Code make wholesale accounting method changes. Likewise, if a corporation did no more than change its name and state of incorporation, it could not under the Code make wholesale accounting method changes. Combining these two events, neither of which would be sufficient alone, will not permit a corporation to make wholesale accounting method changes. Nothing in the Internal Revenue Code of 1954 contemplates such a result.

Mr. Justice Holmes, sitting on circuit in Johnson v. United States, 1 Cir.1908, 163 F. 30, 32, 18 L.R.A.,N.S., 1194, eloquently stated how we should interpret congressional enactments such as the sections here under discussion:

"A statute may indicate or require as its justification a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur to the mind. The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before."

The Tax Court's position might have more force if the change in proprietary interests were to new persons and less than 50% of the former stockholders' interest in the old corporation remained in the new corporation. Then the change begins to look like a sale of the assets to a new and legally separate entity followed by a bona fide liquidation. Compare the discussion in Levin, The Case for a Stepped Up Basis to the Transferee in Certain Reorganizations, 17 Tax.L.Rev. 511. But just how much of a complete redemption would be required to avoid the impact of section 381? Would 1% be enough? Sufficient continuity of interest has been found where 67% or 69% of the old corporation's stockholders control the new corporation. Reilly Oil Co. v. Commissioner of Internal Revenue, 5 Cir. 1951, 189 F.2d 382; Western Mass. Theaters v. Commissioner of Internal Revenue, 1 Cir.1956, 236 F.2d 186. Changes of less than 50%, as we have here, or for that matter any change not sufficient to prevent the finding of a reorganization should not be sufficient to prevent the operation of section 381. The corporate enterprise went on as before, no new blood was injected and all that took place was a redemption followed by a change in name.

We hold, therefore, that the changes made in the Code in 1954 make the *Southwest Consolidated* decision inapplicable here. We hold also that under the 1954 Code this transaction constituted both a 368(a) (1) (D) and a 368(a) (1) (F) reorganization.

### C.

On its facts *Southwest Consolidated* does not apply to this case. If we view the instant case as involving two separate and independent occurrences, *Southwest Consolidated* would test only the reorganization aspects of the case.[15] *Southwest Consolidated* took up *seriatim* the differ-

---

15. *Southwest Consolidated* would only apply to the change in name, not the redemption which would be tested under section 302. Interestingly, *Southwest Consolidated* also found that no 368(a) (1) (D) reorganization had taken place. If strictly applied to this case, no (D) type reorganization would be present here. However, the facts of the instant case are so different from *Southwest Consolidated* that there is in the instant case a reorganization. That being true, we should go further and determine what type of reorganization best fits the facts of the instant case.

ent definitions of a corporate reorganization under the 1939 Code. It dispatched the (F) type question in one sentence.

*Southwest Consolidated* involved the problems of an insolvency reorganization. The original corporation was hopelessly in debt and its creditors had, through judicial intervention, undertaken the task of reorganizing it. In simple terms, a new corporation was formed and the assets of the old corporation were transferred to the new corporation with the creditors becoming the stockholders. It was this shift in the proprietary interest from the stockholders to the creditors which the Supreme Court held sufficient to prevent a reorganization.

In holding that none of the reorganization provisions applied, the Court said (315 U.S. 194, at 202, 62 S.Ct. 546, at 552, 86 L.Ed. 789) :

> "Indeed, clause C [presently 368(a) (1) (C)] contemplates that the old corporation or its stockholders, rather than its creditors, shall be in the dominant position of 'control' immediately after the transfer and not excluded or relegated to a minority position. Plainly, the normal pattern of insolvency reorganization does not fit its requirements.

> "Clause D [presently 368(a) (1) (E)] is likewise inapplicable. There was not that reshuffling of a capital structure within the framework of an existing corporation, contemplated by the term 'recapitalization'. And a transaction which shifts the ownership of the proprietary interest in a corporation is hardly 'a mere change in identity, form, or place of organization' within the meaning of clause E [presently 368(a) (1) (F)]."

Clearly, the Supreme Court viewed the sale of the old corporation's assets to a new corporation with different stockholders as a substantial change in "the ownership of the proprietary interest." With this there can be no dispute, but that is not our case. We do not have a shift in the ownership of the proprietary interest in the sense that the assets have been sold to entirely new stockholders. At best we

have a complete redemption covered by section 302 which, like all redemptions, means the remaining stockholders have increased their proprietary interest.

For the foregoing reasons, we hold that *Southwest Consolidated* does not control this case and that this is a § 368(a) (1) (F) reorganization.

Affirmed on the appeal; reversed on the cross-appeal; remanded for further consideration by the Tax Court not inconsistent with the reversal.

BELL, Circuit Judge, dissenting in part:

I respectfully dissent from Part IV of the majority opinion. I do not think that the transaction in question constituted a corporate reorganization within the meaning of § 368(a) (1) (F). That section has been construed by the Supreme Court as being inapplicable where there is a shift in proprietary interest. Helvering v. Southwest Consolidated Corporation, 1942, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789. 3 Mertens, Law of Federal Income Taxation, § 20.94. Here there was a clear and substantial change in propriety interest. The Favrot group was eliminated.

This is to be distinguished from the situation where only minor and technical differences between the original and surviving corporation will justify classification as a reorganization under § 368(a) (1) (F). See, for example, Davant v. Commissioner of Internal Revenue, 5 Cir., 1966, 366 F.2d 874, involving two corporations having precisely the same stockholders and propriety interests. The assets of one corporation were conveyed to the other. And the court held the result to be a § 368(a) (1) (F) corporate reorganization. The court concluded that whether the assets were held by one or the other corporations made no practical difference and that the shift of the assets between them in view of the complete identity of stockholders and their proprietary interest, resulted in a mere change in identity or form. There was a change in corporate vehicles but not in substance. Cf. Pridemark, Inc. v. Com-

missioner of Internal Revenue, 4 Cir., 1965, 345 F.2d 35, 42; and see "The Reincorporation Game: Have the Ground Rules Really Changed?", 77 Harv.L.Rev. 1218, 1248 (1964).

There is nothing in § 381 of the Code, 26 U.S.C.A. § 381, or elsewhere, to overrule the specific holding of Helvering v. Southwest Consolidated Corporation, supra, and it is our duty, as was the case with the Tax Court, to follow that decision in the absence of more specific congressional direction. My view is that this was not an appropriate case for the application of § 368(a) (1) (F).