BERCY INDUSTRIES, INC., AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5879–76.    Filed April 17, 1978.

*Don M. Pearson and Robert P. Beckham,* for the petitioner.
*Marion L. Westen,* for the respondent.

---

[11]Pub. L. 91–172, 83 Stat. 644.

STERRETT, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes for its fiscal years ended May 25, 1968, and May 31, 1969, in the amounts of $18,786 and $367,638, respectively. Due to petitioner's previous acceptance of many of respondent's adjustments the remaining issue for decision is whether petitioner may carry back, under section 172, I.R.C. 1954, a post-reorganization net operating loss, for the short period April 23, 1970, through December 31, 1970, to the pre-reorganization income of an acquired corporation for its taxable years ended May 25, 1968, and May 31, 1969.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioner Bercy Industries, Inc., and subsidiaries, is a corporation organized under the laws of the State of California with its principal office in Pasadena, Calif. Bercy Industries, Inc., is the corporate successor to Beverly Manor Inc. of Santa Clara to whom the statutory notice of deficiency was also sent. Petitioner's corporate tax returns for the taxable years ended May 25, 1968, and May 31, 1969, were timely filed with the Internal Revenue Service Center, Ogden, Utah.

On April 12, 1968, petitioner was incorporated under the laws of the State of California under the name of Beverly Manor Inc. of Santa Clara (hereinafter Beverly Manor). From its incorporation until April 23, 1970, Beverly Manor was a shell corporation and had no operating business activity whatsoever. Since its incorporation, and at all times thereafter, Beverly Manor's sole shareholder was Beverly Enterprises (hereinafter Beverly).[1] As of April 17, 1968, Beverly Manor's directors and officers were as follows:

Roy E. Christensen ......... president, treasurer, and director
Edward L. Rimpau, Jr .... vice president, secretary, and director
William F. Rinehart ........ assistant secretary and director

On July 19, 1968, Orlin C. Munns replaced Edward Rimpau as vice president and director; Christensen and Rinehart served as directors of the corporation until August 15, 1971.

---

[1] Beverly owns 50 shares of Beverly Manor common stock. The stock certificate is dated Jan. 15, 1970.

On July 29, 1965, an entity, Bercy, was incorporated under the laws of the State of California. On September 8, 1966, Bercy changed its name to Bercy Industries, Inc. (hereinafter Old Bercy). The directors and officers of Old Bercy at the date of its incorporation were as follows:

Bernard Fleisher ............ president and director
Seymour Katz ............... vice president-treasurer and director
Harned Petetus Hoose ..... secretary and director

Fleisher and Katz continued as directors and officers of Old Bercy until April 23, 1970.

Old Bercy's business, from date of incorporation to April 23, 1970, was the design, manufacture, and distribution of personal care products. The major product lines were incandescent and fluorescent lighted travel and vanity mirrors. Fleisher and Katz were in charge of the daily operation and management of Old Bercy from its incorporation through April 23, 1970. From the summer of 1969 to April 23, 1970, its principal office was located at 1741 North Ivar Avenue, Hollywood, Calif. Additionally, Old Bercy had a manufacturing plant located in Torrance, Calif.

On April 23, 1970, pursuant to a plan and agreement of reorganization among Beverly, Beverly Manor, Old Bercy, and the shareholders of Old Bercy, Old Bercy merged into Beverly Manor. Beverly Manor, the surviving corporation, pursuant to the merger agreement, changed its name to Bercy Industries, Inc. (hereinafter New Bercy or petitioner). Shareholders of Old Bercy received 171,429 voting common shares of Beverly in sole consideration for the merger.[2] Said shares represented approximately 4.4 percent of the 3,908,536 Beverly shares then outstanding. On the merger date all outstanding shares of Old Bercy were canceled and the Old Bercy shareholders ceased to have any rights to said stock, except the right to participate pro rata in the distribution of shares of Beverly common stock.[3]

---

[2]The plan provided that Beverly issue the required number of its shares to Beverly Manor. Of the 171,429 Beverly shares, 42,857 were placed in escrow to be distributed at a later date. Moreover, we note the stipulation of facts herein provides that 173,572 shares of Beverly voting stock were to be distributed while the reorganization documents provided for 171,429 shares.

[3]Art. I of the agreement of merger provided:

"Upon the effective date of merger (the 'Merger Date') the separate corporate existence of Bercy shall cease, and the Surviving Corporation shall without other transfer succeed to and possess all the properties, rights, privileges, powers and franchises, either of public or private nature, and be subject to all of the obligations, liabilities, restrictions, disabilities and duties of each of the Constituent Corporations."

Moreover the plan and agreement of reorganization provided as follows:

(c) *Financing Commitment.*

On March 4, 1970 Beverly loaned Bercy $200,000 in return for a promissory note of even date. On the Merger Date, said note shall be continued or shall be forgiven by Beverly as a contribution to the capital of the Surviving Corporation. Within thirty (30) days after the Merger Date Beverly will provide an additional $300,000 to the Surviving Corporation either by capital contribution, director loan or guarantee of a bank loan, or any combination of the foregoing or otherwise. * * *

(d) *Tax Free Reorganization.*

The parties adopt this Plan intending that it shall constitute a tax-free reorganization under the provisions of Section 368(a)(1)(A) and related sections of the Internal Revenue Code of 1954, as amended.

Only one set of operating assets was involved in the reorganization, only one set of accounting books was maintained and only one "tax history" was involved. New Bercy received all the assets and assumed all the liabilities of Old Bercy and New Bercy's business was a continuation of Old Bercy's business.

In May 1970 the officers and directors of New Bercy were as follows:

| | |
|---|---|
| Bernard Fleisher | president |
| Seymour Katz | executive vice president |
| J. Robert Holt | vice president |
| Grover Rogers | vice president |
| Orlin C. Munns | secretary & director |
| Roy E. Christensen | director |
| William F. Rinehart | director |

Fleisher and Katz were in charge of the daily operations of

---

The shareholders of Old Bercy at the time of merger received Beverly shares as follows:

| Shareholder | Old Bercy shares owned | Beverly shares received and in escrow |
|---|---|---|
| Bernard L. Fleisher | 66,600 | 108,465 |
| Seymour Katz | 22,200 | 36,156 |
| Penny F. Pynes | 5,263 | 8,572 |
| Richard V. Weiss | 2,500 | 4,063 |
| Morton L. Fisher | 2,000 | 3,257 |
| Melvin L. Sommer | 1,000 | 1,628 |
| Hamilton O. Stanford | 1,000 | 1,628 |
| John R. Stahr | 1,000 | 1,628 |
| Richard Von Zup | 1,000 | 1,628 |
| Hohenberg & Associates, Inc | 1,000 | 1,628 |
| Thomas Baptie | 1,000 | 1,628 |
| William Doornbos | 600 | 977 |
| Myron Emery | 100 | 171 |
| | 105,263 | 171,429 |

New Bercy and they were employed on a month-to-month basis. In November or December of 1970, Fleisher and Katz were no longer employed by New Bercy and Holt assumed the responsibility for petitioner's operations.[4]

New Bercy's offices, after the reorganization, were located at the same addresses as Old Bercy's. In the latter part of 1970 the office at Ivar Avenue was closed and thereafter petitioner's principal offices were located at, what was, Old Bercy's manufacturing plant in Torrance, Calif.

For the short period April 23, 1970, through December 31, 1970, New Bercy incurred a net operating loss. The loss was incurred in connection with the same business activity which was formerly conducted by Old Bercy.[5] Thereafter petitioner filed an application for a tentative carryback adjustment, pursuant to section 6411, offsetting its post-reorganization net operating loss against pre-reorganization taxable income of Old Bercy. Initially, respondent tentatively allowed the application but in the notice of deficiency, dated March 31, 1976, he determined that the refund was erroneous explaining as follows:

> (c) It is determined that the net operating loss deduction you claimed in the amount of $729,313 attributable to Bercy Industries, Inc., for the period April 24, 1970 through December 31, 1970 from the consolidated return of Beverly Enterprises & Subsidiaries for its period ended December 31, 1970 and carried back to the consolidated return of Bercy Industries, Inc., for its period ending May 31, 1969 is not allowable, because the merger effective April 23, 1970 between you, Bercy Industries, Inc., and Beverly Manor of Santa Clara, Inc., a subsidiary of Beverly Enterprises, Inc. in exchange for voting stock of Beverly Enterprises, Inc. the only asset of Beverly Manor of Santa Clara, Inc., was a reorganization within the meaning of Section 368(a)(1)(A) of the 1954 Internal Revenue Code. It is further determined that the reorganization did not qualify under the provisions of Sections 368(a)(1)(B) or 368(a)(1)(F) of the 1954 Internal Revenue Code. Accordingly, the full amount of the net operating loss deduction has been disallowed and the tentative allowance must be recouped.

## OPINION

Section 381(a)[6] provides the general rule for carryovers "In

---

[4]Holt was vice president of corporate development for Beverly in 1970 and negotiated the acquisition of Old Bercy on behalf of Beverly. He was an officer of Beverly Manor prior to the merger.

[5]At the time of the merger it was anticipated that Old Bercy's business would continue to be profitable.

[6]SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation * * *

the case of the acquisition of assets of a corporation by another corporation," and section 381(b) provides the operating rules thereto. Under section 381(b)(3)[7] the acquiring corporation in a reorganization described in subparagraph (A), (C), or (D) of section 368(a)(1) is not entitled to carryback a post-reorganization net operating loss to a taxable year of the transferor (acquired) corporation. Specifically, 381(b)(3) does not apply in the case of an acquisition in connection with a (B), (E), or (F) reorganization. Sec. 1.381(a)–1(b)(3)(i), Income Tax Regs.

Section 368(a)(1)[8] lists six types of transactions that are included within the term "reorganization." Except for the statutory exception under section 368(a)(2)(A), treating a transaction as a (D) reorganization when it meets the description of both a (C) and (D) reorganization, the six reorganization definitions are not mutually exclusive. *Berger Machine Products, Inc. v. Commissioner*, 68 T.C. 358, 364 (1977). For example,

---

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D) * * * or (F) of section 368(a)(1).

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

[7]SEC. 381(b) OPERATING RULES.—Except in the case of an acquisition * * *

(3) The corporation acquiring property in a distribution or transfer described in subsection (a) shall not be entitled to carry back a net operating loss or a net capital loss for a taxable year ending after the date of distribution or transfer to a taxable year of the distributor or transferor corporation.

[8]SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

(A) a statutory merger or consolidation;

(B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition);

(C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded;

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

(E) a recapitalization; or

(F) a mere change in identity, form, or place of organization, however effected.

it has been held that a transaction qualifying as an (A) reorganization may also be an (F) reorganization and carryback of a post-reorganization net operating loss to a taxable year of the acquired corporation will be permitted. *Estate of Stauffer v. Commissioner*, 403 F.2d 611, 617 (9th Cir. 1968), revg. 48 T.C. 277 (1968), but see *Berger Machine Products, Inc. v. Commissioner*, *supra* at 364.

Cognizant of the above we note, at the outset, that petitioner, on brief, concedes that the transaction in the instant case does not qualify as an (E) or (F) reorganization. However petitioner contends that, although the transaction is an (A) and/or (C) reorganization, it also is a (B) reorganization, to wit, the shareholders of Old Bercy received, from Beverly Manor, voting common stock of petitioner's parent, Beverly, as the sole consideration for their stock. Petitioner, citing Rev. Rul. 67–448, 1967–2 C.B. 144; Rev. Rule 74–564, 1974–2 C.B. 124; and Rev. Rul. 74–565, 1974–2 C.B. 125, submits that respondent has recognized that this type of triangular reorganization is a constructive (B) reorganization.

In Rev. Rul. 67–448, 1967–2 C.B. 144,[9] corporation P wanted to acquire 100 percent of corporation Y and preserve Y's corporate status. An outright (B) reorganization was not possible as some Y shareholders might not agree to the transaction. Therefore the plan of reorganization was consummated as follows:

(a) P transferred shares of its voting stock to its newly formed subsidiary, S, in exchange for shares of S stock.

(b) S (whose only asset consisted of a block of the voting stock of P) merged into Y in a transaction which qualified as a statutory merger under the applicable state law.

(c) * * * the S stock owned by P was converted into Y stock. At the same time the Y stock held by its shareholders was exchanged for the P stock received by Y on the merger of S into Y. The end result of these actions was that P acquired from the shareholders of Y in exchange for its own voting stock more than 95 percent of the stock of Y.

The ruling stated that the transaction was not an (A) or (C) reorganization "because no assets of Y were transferred to nor acquired by another corporation," but that it qualified as a (B) reorganization, explaining as follows:

It is evident that the shortest route to the end result described above would

---

[9]The other cited revenue rulings reached results based, in part, upon this earlier ruling.

have been achieved by a transfer of P voting stock directly to the shareholders of Y in exchange for their stock. This result is not negated because the transaction was cast in the form of a series of interrelated steps. The transitory existence of the new subsidiary, S, will be disregarded. The effect of all the steps taken in the series is that Y became a wholly owned subsidiary of P, and P transferred solely its voting stock to the former shareholders of Y.

We note that the (B) subsidiary reverse merger technique was codified, liberalized, and qualified as a hybrid (A) reorganization in January 1971 with the enactment of section 368(a)(2)(E),[10] Pub. L. 91–693, sec. 1(a).

Respondent contends that the above revenue ruling is not applicable herein and the transaction cannot be classified as a (B) reorganization. He asserts that, pursuant to article I of the agreement of merger, petitioner did not acquire Old Bercy stock in exchange for its parent stock. At the date of merger all outstanding shares of Old Bercy were canceled and petitioner did not receive the stock of a viable corporation. Therefore immediately after the acquisition, petitioner did not have control of Old Bercy within the meaning of section 368(a)(1)(B). Moreover, in Rev. Rul. 67–448, *supra*, the subsidiary corporation, S, had a transitory existence; it was formed solely for the purpose of effectuating an exchange of P stock for Y stock. Herein petitioner had been in existence since 1968 and continued to exist, receiving Old Bercy's assets and assuming all its liabilities.

We agree with respondent that the transaction is not a (B) reorganization although we disagree, somewhat, with his reasoning. We are unable to see any difference, in substance, between (1) Old Bercy transferring its stock to petitioner in exchange for Beverly stock followed by cancellation of said Old Bercy stock, and (2) cancellation of Old Bercy stock prior to its shareholders' receiving Beverly stock.

The decisive element disqualifying the transaction as a (B)

---

[10]SEC. 368(a)(2)(E). STATUTORY MERGER USING VOTING STOCK OF CORPORATION CONTROLLING MERGED CORPORATION.—A transaction otherwise qualifying under paragraph (1)(A) shall not be disqualified by reason of the fact that stock of a corporation (referred to in this subparagraph as the "controlling corporation") which before the merger was in control of the merged corporation is used in the transaction, if—

(i) after the transaction, the corporation surviving the merger holds substantially all of its properties and of the properties of the merged corporation (other than stock of the controlling corporation distributed in the transaction); and

(ii) in the transaction, former shareholders of the surviving corporation exchanged, for an amount of voting stock of the controlling corporation, an amount of stock in the surviving corporation which constitutes control of such corporation.

reorganization is the fact that, after the dust had settled, the acquired corporation (Old Bercy) and its stock were no longer in existence. Old Bercy had disappeared into petitioner and its stock had been canceled. Thus, instead of acquiring stock, what petitioner acquired were assets and that simply is not a (B) reorganization. That the transaction could have been structured differently to accomplish the same result with carryback benefits is beside the point. In the name of practicality or equity we are not permitted to rewrite history except in the rarest of circumstances. This is not a case where the economic realities of the situation require a different result.

Even the fact that we could have a (B) reorganization followed by liquidation of Old Bercy into petitioner would not change our conclusion. Combination of the two interrelated steps would properly be regarded as a (C) reorganization. See sec. 1.382(b)–1(a)(6), Income Tax Regs.; *Dana v. Commissioner*, 103 F.2d 359, 362 (3d Cir. 1939), affg. 36 B.T.A. 97 (1937); *Vest v. Commissioner*, 57 T.C. 128, 141 n. 5 (1971), revd. and affd. on other issue 481 F.2d 238 (5th Cir. 1973); R. Goldman, "The C Reorganization," 19 Tax L. Rev. 31, 37 (1964); and M. Ferguson and M. Ginsburg, "Triangular Reorganizations," 28 Tax L. Rev. 159, 171–173 (1973).[11]

The transaction in the instant case, a triangular merger is, also, a hybrid (A) reorganization pursuant to section 368(a)(2)(D).[12] However section 368(a)(2)(D) is only of use if Old Bercy's assets could have been conveniently transferred to petitioner. Therefore, as previously noted, to codify and liberalize the (B) subsidiary reverse merger, section 368(a)(2)(E) was enacted in 1971, to allow, for example, petitioner to merge into Old Bercy with Old Bercy shareholders receiving Beverly stock. We believe there are substantial differences between a triangular merger and a reverse triangular merger. In this respect, we

---

[11]Of course, to qualify as a (C) reorganization, petitioner's assumption of Old Bercy's liabilities would have to meet the test of sec. 368(a)(2)(B).

[12]SEC. 368(a)(2)(D). STATUTORY MERGER USING STOCK OF CONTROLLING CORPORATION.—The acquisition by one corporation, in exchange for stock of a corporation (referred to in this subparagraph as "controlling corporation") which is in control of the acquiring corporation, of substantially all of the properties of another corporation which in the transaction is merged into the acquiring corporation shall not disqualify a transaction under paragraph (1)(A) if (i) such transaction would have qualified under paragraph (1)(A) if the merger had been into the controlling corporation, and (ii) no stock of the acquiring corporation is used in the transaction.

note that the House Ways and Means Committee report on section 368(a)(2)(E)[13] stated that a triangular merger in either direction would be tax free and indicated its awareness that a reverse triangular merger was more than formally distinguishable from the triangular merger.[14] See also 28 Tax L. Rev., *supra* at 182–183.

We turn next to petitioner's second contention, advanced in the alternative, that "when a shell corporation with no prior tax history is combined with an operating business in a tax-free reorganization, none of the allocation or tracing problems which section 381(b)(3) was designed to avoid are present, and under such circumstances Congress intended that any net operating loss under section 172 could be carried back regardless of the label put on the type of reorganization." *Aetna Casualty & Surety Co. v. United States*, 568 F.2d 811 (2d Cir. 1976), rehearing denied 568 F.2d at 823 (2d Cir. 1977).

In *Aetna Casualty & Surety Co. v. United States, supra*, Aetna Life Insurance Co. (Life) owned 61.61 percent of the outstanding voting common stock of Aetna Casualty accordingly, the Court could "see no reason why the result should be different simply because the redemption occurs in the course of merging one corporation into a different shell." *Casco Products Corp. v. Commissioner*, 49 T.C. 32, 37 (1967); *Reef Corp. v. Commissioner*, 368 F.2d 125, 130 (5th Cir. 1966), cert. denied 386 U.S. 1018 (1967).

Moreover in denying the Government's petition for rehearing the court stated 568 F.2d at 823:

In ruling that sec. 381(b)(3) did not bar the loss carryback, we concluded that the reorganization was exempted from the prohibition of sec. 381(b)(3) because it fell within the definition of sec. 368(a)(1)(F), and (F) reorganizations are specifically exempted from the bar of sec. 381(b)(3). We ruled that the reorganization was an (F) reorganization only for purposes of determining the reach of sec. 381(b)(3). We specifically declined to decide whether classifying a reorganization as an (F) reorganization for purposes of sec. 381(b)(3) would

---

[13]H. Rept. 91-1778, 91st Cong., 2d Sess. 2 (1970).

[14]Finally we find no merit in petitioner's argument that if Old Bercy survived in a subsidiary reverse merger and then, subsequently, a new corporation located in a different State was formed to carry on the business of Old Bercy, we would have a (B) followed by an (F) reorganization and the loss carryback would be allowed. Once again, the step-transaction, integrated-transaction, doctrine would be applicable. See, for example, *American Potash & Chemical Corp. v. United States*, 399 F.2d 194, 202 (Ct. Cl. 1968); *King Enterprises, Inc. v. United States*, 418 F.2d 511, 516 (Ct. Cl. 1969); *Resorts International, Inc. v. Commissioner*, 60 T.C. 778, 789 (1973), affd. and revd. in part 511 F.2d 107 (5th Cir. 1975); *Yoc Heating Corp. v. Commissioner*, 61 T.C. 168, 177 (1973).

necessarily mean it is an (F) reorganization for purposes of other provisions of the Code     F.2d    , slip op. 6074.

           \*        \*        \*        \*        \*        \*        \*

We are concerned here with a reorganization in which a corporation is merged into a corporate shell with no prior business or tax history of its own. Since this reorganization presents none of the accounting or allocation problems that might arise in reorganizations involving two corporations each with a prior business and tax history, we concluded that Congress did not intend the loss carryback to be unavailable. In our view, it makes no difference whether effectuating Congressional intent in the circumstances of this reorganization is achieved by construing sec. 368(a)(1)(F) somewhat broadly to include the reorganization and Surety Co. (Old Casualty). Life wished to remove Old Casualty from its tax base and formed a wholly owned shell subsidiary, Farmington Valley Insurance Co., (Farmington) for the purpose of acquiring the assets of Old Casualty. Life transferred 13.3 million of its voting shares to the new subsidiary in exchange for all 1,000 shares of Farmington. Then, pursuant to a reorganization plan, Farmington exchanged its sole assets (Life stock) for the voting common stock held by Old Casualty shareholders. Life stock received by Life (in return for its 61.61 percent in Old Casualty) was retired and Old Casualty stock was canceled. Farmington changed its name to New Casualty and by operation of State merger law succeeded to all of the assets and liabilities of Old Casualty.

The Second Circuit, in reversing the District Court,[15] stated that (1) absent a shift in the proprietary interest of Old Casualty, the transfer of Old Casualty to a shell corporation constitutes an (F) reorganization and (2) a corporation which merely redeems its minority shareholders' stock has not undergone a reorganization under section 368(a)(1). Under both premises the corporation would be entitled to carryback its net operating losses and,

of Old and New Aetna, or by construing sec. 381(b)(3) somewhat narrowly so as to be inapplicable to this particular reorganization. Either way, a loss carryback favored by the policies of the Code, see secs. 172 and 832(c)(10), and not presenting the problems with which the prohibition of sec. 381(b)(3) was concerned, is allowed. \* \* \*

Obviously, petitioner would like us to follow the Second Circuit's above quoted reasoning, "construing section 381(b)(3) somewhat narrowly," and allow the carryback.

We need not here take exception to the approach of the Second Circuit. There the court was able to root its argument on a finding that an (F) reorganization had taken place, at least for

---

[15]*Aetna Casualty & Surety Co. v. United States*, 403 F. Supp. 498 (D.C. Conn. 1975).

40

the purposes of section 381(b)(3). We have no such lifeline here and we cannot apply that approach in a statutory vacuum.

Clearly, in the instant case, there has been a major shift in the proprietary interests of Old Bercy. Shareholders of Old Bercy received approximately 4.4 percent of Beverly stock and Beverly, through its wholly owned subsidiary gained control of, what was, Old Bercy's business. Even under the holding of *Aetna Casualty & Surety Co., supra,* this was "hardly 'a mere change in identity, form, or place of [re]organization'." *Helvering v. Southwest Corp.,* 315 U.S. 194, 202–203 (1942).

In sum, the transaction does not fall within the statutory exclusionary framework nor, most probably, the congressional intent embodied in section 381(b)(3). Petitioner's loss carryback must be denied.

*Decision will be entered under Rule 155.*